KNICKERBOCKER HOSPITAL, Plaintiff, *v.* NATHANIEL L. GOLDSTEIN, Attorney-General of the State of New York, Defendant.

Supreme Court, Special Term, New York County, April 19, 1943.

*Giddings & Wilkins* for plaintiff.

*Nathaniel L. Goldstein, Attorney-General (Corning G. McKennee* of counsel), for defendant.

BERNSTEIN, J. The plaintiff is what is commonly known as a voluntary hospital. It was incorporated in 1862 under the name of Manhattan Dispensary pursuant to " An Act for the incorporation of benevolent, charitable, scientific and missionary societies " passed April 12, 1848 (L. 1848, ch. 319), for the particular purpose of " providing and furnishing medicines and medical and surgical aid to such persons as may be in need thereof and unable by reason of poverty to procure the same." The name of the hospital was changed to The J. Hood Wright Memorial Hospital in 1895 and to Knickerbocker Hospital in 1913, but its ministration to the sick and the needy has been continuous through all the years of its existence.

In 1922 the plaintiff acquired a tract of land on Convent Avenue and 130th Street, in the city of New York, and several years later erected thereon a modern hospital building comprising wards for the treatment of indigent patients, private pavilions for pay patients, a nurses' home, out-patient departments, and fully equipped operating rooms, X-ray laboratories and clinics. During 1941 it treated a total of 3,985 in-patients, of whom 2,406 were ward patients. During 1942 it treated a total of 3,727 in-patients, of whom 1,952 were ward patients. During each of those years it treated many more thousands in its clinics and out-patient departments. In addition thereto, the plaintiff maintains and operates, under contract with the City of New York, an ambulance service covering the entire west side of the borough of Manhattan, between 72nd Street and 145th Street, which averages over 16,000 calls and involves the emergency treatment of over 7,000 cases yearly.

Although the hospital has been capably and economically managed it has, like all other voluntary hospitals, been operated at a loss for several years past. Prior to 1940 the yearly operating losses were largely balanced by the receipt of nonoperating income from investments, contributions and membership dues. Since then, however, economic conditions flowing out of the World War have not only produced an increase of operating losses but a decline of nonoperating income. The hospital consequently ended up with a net deficit of $82,694.39 in 1941 and a net deficit of $69,044.64 in 1942 and, on the basis of its budget report, anticipates a further net deficit of approximately $61,000 in 1943. Those fixed deficits have heretofore been met by the sale of securities in the permanent fund which were unrestricted as to use, but with such securities now almost exhausted the hospital finds itself without funds to meet its anticipated deficits and to continue its services. In fact, it asserts quite frankly that

unless it is granted the emergency relief sought in this action it will be compelled to suspend operations and close its doors.

For many years prior to his death in 1895, James Hood Wright was the president of the hospital and its most generous patron and benefactor. By his will, admitted to probate in the Surrogate's Court, New York County, on April 1, 1895, he bequeathed to the hospital a portion of his residuary estate, then valued at about $1,000,000. The language of the bequest was as follows: "All the rest, residue and remainder of the said one-third part of my residuary estate shall be given and delivered to the Manhattan Dispensary, at 131st Street and Tenth Avenue, in the City of New York, the principal of such sum to be kept invested and the income thereof to be maintained as a permanent investment during the continuing operation of the said Dispensary, and the yearly income thereof to be used for its general purposes — provided, however, that not more than one hundred thousand dollars of said principal sum may be invested or applied in the construction of buildings for the said Dispensary." (Article Eleventh, section 3 i.)

During the earlier lean years referred to, the income of this fund helped balance the hospital's budget, but, in the face of mounting operating deficits, it is no longer able to do so.

To save what appears to be an inevitable suspension of a valuable community service — the need for which will become more pressing with the return and rehabilitation of the members of our armed forces — and prevent a failure of a definite charitable purpose, the plaintiff has invoked the equitable jurisdiction of this court. It asks the court to determine and decree that, in the existing exigency and under such restrictions as the court may define, it be authorized and empowered to use so much of the principal of the James Hood Wright fund as may be necessary to keep its hospital in operation, free from the limitation specified in the bequest, to the end that the general purpose of its benefactor shall not fail. That it has the right to invoke the court's aid in an action to which the Attorney-General is the sole party defendant is no longer in doubt. (*Trustees of Sailors' Snug Harbor* v. *Carmody,* 158 App. Div. 738, affd. 211 N. Y. 286, 300.)

The bequest to the plaintiff was an absolute gift and not a trust. (*Matter of Griffin,* 167 N. Y. 71, 84; *St. Joseph's Hospital* v. *Bennett,* 281 N. Y. 115, 120.) Even so, a charitable organization " may not, however, receive a gift made for one purpose and use it for another, unless the court applying the *cy pres* doctrine so commands." (*St. Joseph's Hospital* v.

*Bennett, supra,* p. 123.) In this case the plaintiff has based its application for relief not only upon the court's equity power to apply the *cy pres* doctrine, but upon the express provisions of section 12 of the Personal Property Law, sometimes referred to as one of the Tilden Acts. Subdivision 2 of that section provides: " The supreme court shall have control over gifts, grants and bequests in all cases provided for by subdivision one of this section, and, whenever it shall appear to the court that circumstances have so changed since the execution of an instrument containing a gift, grant or bequest to religious, educational, charitable or benevolent uses as to render impracticable or impossible a literal compliance with the terms of such instrument, the court may, upon the application of the trustee or of the person or corporation having the custody of the property, and upon such notice as the court shall direct, make an order directing that such gift, grant or bequest shall be administered or expended in such manner as in the judgment of the court will most effectually accomplish the general purpose of the instrument, without regard to and free from any specific restriction, limitation or direction contained therein; * * *.' "

Where a literal compliance with the terms of a gift has become impracticable, that statutory enactment has been held to warrant the administration of the gift so as best to carry out its purpose. (*Sherman* v. *Richmond Hose Co. No. 2,* 230 N. Y. 462.) Where unforeseen and unforeseeable conditions have conspired to prevent the use of a charitable gift in the manner prescribed by the donor, that statutory enactment has been held to authorize its use in such manner as may most generously accomplish his general charitable intention. (*Trustees of Sailors' Snug Harbor* v. *Carmody, supra; City Bank Farmers Trust Co.* v. *Arnold,* 283 N. Y. 184; *Matter of Gary,* 248 App. Div. 373, affd. 272 N. Y. 635; *Matter of Meyers,* 166 Misc. 712; *Matter of Pulitzer,* 139 Misc. 575, affd. 237 App. Div. 808.)

The close association of the testator with the hospital, his activities in its behalf, and his generous benefactions and endowments for its support during his lifetime, evince his great interest in its maintenance as a hospital. The bequest to it of a substantial part of his estate indicates a paramount desire that it shall be continued as a hospital. The will speaks of its " continuing " operation. All those things establish the testator's general charitable purpose that the hospital shall endure. To one of his day a million dollars was calculated to produce an income which would ordinarily suffice to maintain forever an institution of the limited scope of the hospital of that time. He did not and could not foresee the vast changes that the passing

years have produced. He could not predict the advent of a world war and of economic stress. Those changed conditions are the changed circumstances referred to in the statute which call for the intervention of a court of equity to direct an administration that " will most effectually accomplish the general purpose of the instrument, without regard to and free from any specific restriction, limitation or direction contained therein ".

The same result must follow from the application of the rule of *cy pres*.

" While courts of equity, as such, possess no power to create a charitable trust, they liberally exercise a jurisdiction to enforce and preserve such a trust when it is valid in its creation. In exercising this jurisdiction the courts proceed *cy pres*. They give effect to the expressed charitable purposes of the donor as near as may be; and in supplying or remedying the defects disclosed in practice they act in effectuation of the controlling purpose disclosed by the instrument presented for construction, so as to preserve and make useful ' what may be called the spirit of the charity ' [citing case]. It is a natural and necessary branch of the jurisdiction over charitable trusts that the means or details prescribed for their administration should be subject to be molded so as to meet any exigency which may be disclosed by a change of circumstances, and to relieve the trust from a condition which imperils or endangers the charity " (*Lackland v. Walker,* 151 Mo. 210, 248).

It is evident that the expressed charitable purpose of the donor was to have the hospital carry on the work of ministering to the sick and the indigent. The deficiency of income for that purpose is a defect which must be supplied to preserve the spirit of the charity. The bequest must be molded to meet the exigency disclosed by the great changes that have taken place. (*Matter of Neher,* 279 N. Y. 370; *City Bank Farmers Trust Co.* v. *Arnold, supra.*)

While expressing sympathy for the problem that confronts the plaintiff, the Attorney-General cites the case of *St. Joseph's Hospital* v. *Bennett* (281 N. Y. 115, *supra*) as authority for the denial of the relief sought. That case, however, is clearly distinguishable. Under the will of the testator in that case the income of the endowment fund created by him was to be used for the ordinary expenses of maintenance. The plaintiff there, asserting that the gift was an absolute one, proposed to use it to pay off a debt secured by a mortgage on its property or, in its judgment, to use the principal for purposes other than meeting the ordinary expenses of maintenance. It sought to procure a declaratory judgment adjudging that both the principal and

income of the fund might be used for such purposes as it might see fit to use them. The Special Term, holding that the bequest was an absolute gift, granted the plaintiff's motion for judgment on the pleadings. Upon appeal that judgment was affirmed by the Appellate Division. In reversing the judgment of the lower courts the Court of Appeals held that a gift that had been made for maintenance purposes could not be used for the purpose of paying off a mortgage, " unless the court applying the *cy pres* doctrine so commands ". The plaintiff there had made a broad claim that it was entitled to use the fund for *any* purpose for which its charter provided. The Court of Appeals denied that broad claim but left the door open for *an application to vary the terms of the gift where a change of circumstances warranted.* Here, the plaintiff does not contend that it has the right to use the principal of the fund for any of its corporate purposes. It merely seeks the aid of the court, under section 12 of the Personal Property Law or under its general equity power, to apply the *cy pres* rule to the situation disclosed and grant it emergency relief, to the end that it may continue to function as the testator intended it to function. In the circumstances disclosed, neither reason nor authority warrants the denial of such aid under conditions that will safeguard the laudable purposes of the testator and preserve a worth-while charity. Those conditions will be considered and fixed upon the settlement of the decree to be entered hereon.

Judgment in accordance with the foregoing views is directed for the plaintiff, without costs. Settle decision and judgment.